**UNITED STATES of America ex rel.
Michael P. HEALY, Petitioner,**

v.

**George S. BEATTY, Jr., Brigadier General, United States Army, and Stanley R. Resor, Secretary, United States Army, Respondents.**

**No. 2469.**

United States District Court
S. D. Georgia.

June 18, 1969.

Peter Rindskopf, Howard Moore, Jr., Atlanta, Ga., for petitioner.

Richard C. Chadwick, Asst. U. S. Atty., Savannah, Ga., for respondents.

## ORDER

LAWRENCE, Chief Judge.

### I

Private Michael P. Healy, Army Medical Corps, who is presently stationed at Fort Stewart, Georgia, filed a petition for the writ of habeas corpus in this Court. An evidentiary hearing was held on May 14, 1969.

The record shows that Healy was inducted on June 17, 1968, under orders issued by Selective Service System Local Board No. 32 at Houghton, Michigan. Prior to induction, Petitioner had been granted an I–S classification [student deferment]. Following his graduation from college, he was reclassified as I–A. Thereafter, several deferments were sought and obtained by Healy. On February 8, 1968, an order to report for induction was issued. Upon receipt of the order, Petitioner requested transfer to Local Board 14, Norman, Oklahoma. On March 18, 1968, he applied to Local Board No. 32 in Houghton, Michigan for an I–A–O classification of conscientious objector.[1] The application for noncombatant service was granted.

On June 17, 1968, Healy was inducted into the Army and was assigned to noncombatant service and training at the Army Medical Training Center, Fort Sam Houston, Texas. Since that time he has served in the Medical Corps.

In September of 1968, he requested discharge as a conscientious objector in accordance with Title 32 Code of Federal Regulations § 51.5. A psychiatric examination required as a part of the discharge procedure revealed no psychiatric disorder. The Applicant was described as "a neat-appearing, cooperative, polite and soft-spoken young man who speaks clearly and to the point. He demonstrates no disorder of thinking, effect, or intellectual functioning, and no other significant psychopathology is apparent."

On October 24, 1968, Healy's commanding officer recommended disapproval after undertaking the required interview. He reported that "it is my opinion that his application is based on his own philosophical views and a merely personal moral code rather than the teachings and beliefs of the Catholic Church."

On November 5th the Commanding Colonel, Medical Corps, at Fort Sam Houston, recommended denial because "there is no indication that there has been a substantial change in his professed religious belief subsequent to his induction." The Adjutant General, Fort Sam Houston, concurred in this recommendation.

In the course of time, Healy's application for discharge went through the various chains of command to the Headquarters of the Department of the Army. The Adjutant General denied discharge on the ground that "Evidence does not show a substantial change in religious beliefs since classification as non-combatant." This disposition was "By order of the Secretary of the Army" and was made on January 21, 1969.

### II

At the threshold of the court room Petitioner is met by Respondent's objection to his right to be there. Jurisdiction of this Court is challenged on the ground that Healy did not exhaust his military remedies before seeking civil redress since he failed to seek relief at the hands of the Board of Corrections for Army Records.[2] On the issue of exhaus-

---

1. "In Class I–A–O shall be placed every registrant who would have been classified in Class I–A but for the fact that he has been found, by reason of religious training and belief, to be conscientiously opposed to combatant training and service in the armed forces." 32 C.F.R. § 1622.-11. In seeking exemption from combatant training and service Healy, on the form he filled out, struck out with his pen the claim of exemption from "both combatant and noncombatant training and service in the Armed Forces."

2. The Board for Correction of Military Records is a board of review composed of civilians from the executive part of the military department empowered to "cor-

tion of military remedies I am confronted by conflicting rulings of the Court of Appeals for the Fourth and the Ninth Circuits which were rendered last March.

### Ninth Circuit

"Following the denials of Craycroft's conscientious objector claims * * * he did not apply to the Board for Correction of Naval Records for correction of an error or for the removal of an injustice. * * * We conclude that Craycroft did not exhaust the administrative remedies that were open to him at the time he sought relief in the District Court * * *."

Craycroft v. Ferrell, 408 F.2d 587, decided March 5, 1969.

### Fourth Circuit

"Additionally, we reject, as did the district court, the notion that petitioner has failed to exhaust his administrative remedies within the Army by failing to seek a correction of his records." [That is, the Court rejected the notion that an applicant, in addition to applying for conscientious objector status · all the way through Army channels (which Healey did), must also apply to the Board of Corrections for Army Records].

United States ex rel. Brooks v. Clifford et al., 409 F.2d 700, decided March 20, 1969.

———◆———

The view expressed by the Court of Appeals for the Fourth Circuit is supported by Gann v. Wilson et al., D.C., 289 F.Supp. 191. There it was held: "Neither is it necessary for him to petition the Army Board for Correction of Military Records before seeking judicial relief from action taken by the Department of the Army which he claims to be arbitrary, and which by Department of Defense Directive 1300.6 is made final." The Directive in question states: "Determination by the Military Department, in accordance with the facts of the case and the guidelines furnished herein, shall be final with respect to the admin-

istrative separation of its members." Further, Army Regulations provide that "Final determination on all requests for discharge based on conscientious objection * * * will be made at Headquarters, Department of the Army." AR 635–20, § 3(d).

Other cases pointing in the same direction as the decision in the Fourth Circuit in United States ex rel. Brooks v. Clifford, *supra*, are Crane v. Hedrick, D.C., 284 F.Supp. 250; United States ex rel. Caputo v. Sharp, D.C., 282 F.Supp. 362; Hammond v. Lenfest, 2 Cir., 398 F.2d 705.[3] In Brown v. Resor, 407 F.2d

rect any military record of that department when he [the Secretary] considers it necessary to correct an error or remove an injustice" Title 10 U.S.C. § 1552. The jurisdiction is of a general nature. However the Board has been principally resorted to by discharged military personnel seeking a modification of discharge status so as to entitle them to veteran's benefits, etc. Unger v. United States, 326 F.2d 996, 164 Ct.Cl. 400; Peterson v. United States, 292 F.2d 892, 155 Ct.Cl. 159; Darby v. United States, 173 F.Supp. 619, 146 Ct.Cl. 211; Goldstein v. United States, 130 F.Supp. 330, 131 Ct.Cl. 228. The Board's jurisdiction is not made clearer by the regulations

of the Secretary of Defense which state that it "shall have jurisdiction to review and determine all matters properly brought before it consistent with existing law." Code of Federal Regulations, Title 32 § 581.3(3).

3. In Hammond v. Lenfest, *supra*, there is a curious statement in a footnote which the Respondents have not explained: "Because of a change of Department of Justice policy, the Government no longer maintains, as it did in the court below, that Hammond's failure to appeal the denial of his request before the Board for Correction of Naval Records constitutes a failure to exhaust administrative remedies." See 398 F.2d 713, n. 12.

## 846

281, decided by the Court of Appeals for the Fifth Circuit, the respondents did not raise the issue that the conscientious objector failed to go all the way to the Board of Corrections before seeking judicial relief. In Craycroft v. Ferrell, et al., *supra*, where it was held that he must do so, the Ninth Circuit stated that "Numerous courts have required that one exhaust all military remedies before coming to a civil court." However, in none of the cases cited in that connection was the issue of separation from service because of conscientious objection involved.

As between the conflicting lines of authority I agree with the cases which hold that the objector does not have to go before the Board of Corrections before turning to the courts. I am the more persuaded of the correctness of this view by the fact that the Army Regulations and Directives say that determination by Headquarters of the Department of the Army is "final" in Conscientious Objector applications. Petitioner's case was carried through that level. I deem this to be an exhaustion of his administrative remedies.

This Court possesses jurisdiction generally since unlawful custody of a person in the Armed Forces is claimed (Hammond v. Lenfest, 2 Cir., 398 F.2d 705) and it is not lost because Petitioner failed to exhaust his remedies.

### III

Healy's post-induction application for discharge was denied on various grounds, namely that it was based on his own philosophical views; that it constituted a merely personal moral code rather than the teachings and beliefs of the Catholic Church; and finally, because there was no evidence to show a substantial change in his religious beliefs after he was classified I–A–O. The last ground is the ground on which the Secretary of the Army relied upon.

Section 6(j) of the Universal Military Training and Service Act (Title 50 U.S.C. App. § 456(j)) says that no person shall be "subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code." The exemption "extends to anyone who, because of religious training and belief in his relation to a Supreme Being, is conscientiously opposed to combatant military service or to both combatant and noncombatant military service." United States v. Seeger, 380 U.S. 163, 173, 85 S.Ct. 850, 13 L.Ed.2d 733.

Under Army Regulations 635–20 § 3, "All requests for discharge will be considered on an individual basis in accordance with the facts and special circumstances in a particular case."[4] So too, in considering the issue of sincerity of religious belief the courts must look at the "totality of the evidence." Gilliam v. Reaves, et al., D.C., 263 F.Supp. 378, 385.

What are Healy's religious beliefs as to war and soldierhood? Are they sincerely held? Are they essentially philosophical or political? Do they merely represent a personal moral code? These and the important question of sincerity are subjective matters. Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428; Jochim v. McAnaw, D.C., 296 F.Supp. 1305; Kessler v. United States, 5 Cir., 406 F.2d 151. In making such fact determinations a judge senses rather than knows. However, doubt as to sincerity cannot be predicated upon "mere speculation." Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132; Crane v. Hedrick, D.C., 284 F.Supp. 250, 255. And the fact-trior must give great weight to the Applicant's claim that his beliefs are an essential part of his religious faith. United States v. Washing-

4. See also Department of Defense Directive 1300.6 § 5.

ton, 6 Cir., 392 F.2d 37. However, the conformance in pattern of the Applicant's past life to the religious convictions he expresses when he seeks discharge is, to me, equally crucial.

Michael Power Healy was born in 1943 of Catholic parents at Houghton, Michigan. His mother died when he was a year old. His father is still living. Michael attended parochial school from 1948–1956 and graduated at Houghton High School in 1960. He then entered Marquette University. During the summer of 1960 he served as counsellor at a Health Camp. At college Healy worked for a time as a clerk in the University book store. His grades at Marquette were above average.

After graduation, he became a volunteer teacher in the Peace Corps. His two years in Nepal were described as "the most exciting, hellish, wonder-filled years I've lived so far." The experience convinced him that "social patterns and religious doctrines are not as important as we sometimes think and should not be considered on a par with a human life." [5] After leaving Nepal Healy worked for a short time in a Peace Corps training program in Hawaii. He then enrolled at the University of Minnesota as a graduate student in philosophy. He soon decided that he was more interested in teaching and during 1967 taught English at a high school in Connecticut as an intern in connection with a postgraduate program of Johns Hopkins. He hoped, after getting a Master's Degree, to obtain a job teaching on an Indian reservation in order to learn something, as he expressed it, from "America's first real moral disaster—the treatment of the American Indians, a perfect example of using people as things for our own sake."

In 1968 Petitioner became connected with VISTA and commenced a training program at the University of Oklahoma. He sought deferment for that purpose, informing his draft board on May 31, 1968 that, "So many in this country have prospered, but there are still many, especially the Indians, the city ghetto dwellers, and those in the rural South, whom we have passed by and ignored."

In seeking exemption as a conscientious objector from his impending draft Healy gave an eloquent testament to his beliefs and disbeliefs. He stated in the application for I–A–O status:

"War is a negation of awareness of ourselves and others as persons. The destruction is impersonal and indiscriminate. Christ, the link encompassing our mortal world and our moral one, urges an ethical attitude which can help a man achieve both an intellectual and a spiritual consciousness and realization of his situation in life and the world. For the past twenty centuries we have rather consistently ignored the message and the example * * * My general position is a result of my Catholic upbringing in which Christ's message of love was stressed, but until my junior year at Marquette University I didn't have a real opinion about these questions. Then in that year I had two fine Jesuit professors, one in Theology and one in philosophy, who just opened the world up to me and showed it with all its confusions and dark corners * * * It is really an act of faith to say that a human being has a value just by means of his existence."

Healy further stated:

"The cardinal rule in getting through life and making something worthwhile out of it is, as far as I can see, to remember that you are a human being, and, as fantastic as it may seem, so is that other person next to you or across the world * * * For example, in this present war, we are bombing populous sections of North Vietnam, aiming for the industries, but knowing we hit civilian areas; the Vietcong, on the same hand, terrorize villagers in the South to gain

5. See Special Form for Conscientious Objector filed by Healy and dated March 7, 1968. Records, Michigan Local Board No. 32, Houghton County.

aid and food, while we remove them to hopelessly inadequate refugee camps."

To the question in the application inquiring what actions and behavior in his life most conspicuously demonstrated the depth of his religious convictions, Healy replied: "The most immediate action I can think of is going through this whole procedure so that I won't have to kill people." Accompanying his request for I–A–O status, he presented several letters, including one from a Catholic priest in Houghton. The letter said, "Simply, I fully support Michael Healy's position as a Conscientious Objector. I believe in him and admire with jealousy his ideals toward his brother Christ whom he finds in people." Petitioner's aunt informed the draft board:

"If there is anyone I know who could conscientiously object to bearing arms in a war in which his country is engaged that man would be Michael Healy. I am not sure I entirely agree with his asking for this classification but I know, in my mind and heart, that it is the only way for him—he could not kill anyone—it would shatter his life. He said in this regard that if he did do it (kill anyone)—'any hope that anyone can act morally in the world would be gone.' "

Healy's post-induction application for discharge from the Army which was filed on October 24, 1968, is a restatement and reaffirmation of the beliefs and attitudes he expressed to the draft board earlier that year. "In a sentence," he summed up, "I believe Christ's message and life of love preclude participation in, or support of the killings and indifference toward men that is war." He further said:

"Value in the world does not reside in political systems or national unity, but in individual persons. The systems and patriotisms are man-made things, useful in many ways, but mutable and at the service of man. Our human life is what we have been given to work with, and it is this life that should be the basis of any hier-archy of values by which we act. The impersonal, mechanical use and destruction of life in war I believe to be unacceptable because it puts man-made concepts of economics and politics above the individual, thereby reducing us all. Our life is a gift and a task. The task is to build from the potentiality, the seed of existence to a love and understanding of God."

■ At the evidentiary hearing I expressed the view that Healy seemed sincere in his beliefs and that I thought he was conscientiously opposed to war. It is difficult to draw a line between religious beliefs and those merely philosophical or political. A person's own moral code may be that and nothing more but it may, at the same time, be derived from religious training and belief. I am no theologian but my impression is that there is nothing in Catholic doctrine or teaching which makes service in war contrary to the tenets of the Church. However, that is not relevant. The conscientious objector classification is based upon the "subjective religious beliefs of the particular individual, not upon the religious tenets of an organization of which he is a member." Keefer v. United States, 9 Cir., 313 F.2d 773, 776; United States v. Simmons, 7 Cir., 213 F.2d 901. No specific doctrinal support is required. United States v. Washington, 6 Cir., 392 F.2d 37. In this connection Healy stated, "While it is true that pacifism or nonviolence has not been a major teaching [of the Church] and indeed there has been a constant tradition maintaining that Christ's message did indeed rule out participation in war."

I take him at his word. And in so doing I am in good company. A chaplain at Fort Sam Houston who interviewed Healy in September, 1968, attested, "I am convinced he is sincere and has a religious basis for his request." (*Vox clamentis in deserto*).

But reaching the conclusion, as I do, that Healy is sincere in his convictions *does not settle the question.* Petitioner specifically requested his draft board to

grant a classification limiting him to noncombatant service. And the Selective Service System would thus classify him today. On December 27, 1968, the Director of the Selective Service System stated that the subject "would be properly classified in Class I–A–O, as a conscientious objector, if he were being considered for classification under the Military Selective Service Act of 1968, at this time."

Where does this leave Private Healy? By seeking and receiving noncombatant status did he waive the right to claim I–O status after induction?

## IV

Army Regulations (635–20 § 3(b)) provide for waiver of conscientious objector status under certain conditions. Failure of the inductee to make timely claim for exemption constitutes a waiver of the right when such classification was not sought prior to induction and where such status was claimed but was denied by the Selective Service System. Healy's case does not fit into either class, for he not only claimed exemption as a conscientious objector but received such a classification.[6]

The Secretary of the Army based the refusal to discharge Petitioner as an I–O on the ground that the evidence showed no substantial change in his religious beliefs since he was classified as noncombatant. Respondents say that the "basis in fact" test must be applied to this finding.

The trouble with this is that I know no basis *in law* for the contention. I am not aware of the legal source of the argument that the want of substantial change in religious belief after induction bars the serviceman from obtaining relief in the courts. There is nothing in the statute, the Regulations or in the de-

cisional law which estops an inductee from claiming, in a proper case, *full* exemption despite his receiving an I–A–O classification as requested. Respondents' argument seems to be founded in waiver and is, I surmise, based upon AR 635–20 § 3 which states (as "Policy") that "Consideration will be given to requests for separation based on bona fide conscientious objection to participation in war, in any form, when such objection develops subsequent to entry into the active military service."

The argument seems to be that Healy's religious beliefs are the same now as they were at the pre-induction stage and hence did not "develop subsequent to entry into the active military service." Indeed, as I recall the evidence, Private Healy conceded this. But this loses sight of the fact that the Regulations speak of the development of conscientious objection to participation in war *"in any form"* after induction, that is to say participation in such noncombatant service as the Medical Corps.

The record in this case indicates that Healy's beliefs *have* undergone material change since induction. He no longer believes that the Medical Corps is a noncombatant arm of the service. In this connection he asserts:

"The first day of training the Commanding Officer of MTC, in explaining his position to the new trainees, said, 'I am a soldier first and a doctor second.[7] And it is stressed in our own training that the medic is to be a soldier first and only then a medic. Of course, what we are trained to be and what we make ourselves can be two different things, but the very structure of the job makes the medic contribute importantly to the killing. The motto of the Army Medical Department is To Conserve Fighting Strength, and this is the heart of the

---

6. The statute and the Army Regulations (32 § 1622.2) indicate that the I–A–O and I–O classifications are sub-classes of "conscientious objector."

7. This statement by Healy was claimed by the Colonel, commanding the Medical Corps at Fort Sam Houston, to be a misquotation. The actual statement made by the Commander was, he said, "I am a soldier and a physician."

matter. In the dispensary and in the hospital it is the medic's job to see that the men are as physically and psychologically fit as possible to do their army work. In the field, in sick call, in sanitation suggestions, in everything he does, the medic prepares the men to fight more effectively. And when they are wounded, he is to patch them up as soon as possible so they can get back to the front to fight and kill again. The paradox of the medical service in the army is that the medic saves lives and relieves pain so that more lives can be lost. I can't help but believe there is no place in the army, even in the medical corps, for one who conscientiously objects to war, because the army has made healing its instrument of war and doctors and medics its soldiers."

I cannot help compare the views of this articulate and literate graduate of a great university with the sentiments of an unlettered farm boy who served as a private in the Eleventh Regiment, Georgia Volunteers, C.S.A. The other day I read a letter that Private James Thompson wrote to his parents from Virginia in March, 1862, in which he said:

"Dont Griev or be troubled about me, and as to lying on a soft feather bead i lie just as confortable as i want to. I can take 2 blankets and lie down in a pile of rocks, or in the mud on frozen Ground, or anywhir without anything to shelter with. My Cotrig Box makes a soft pillow, the Mother Earth makes a easy bed, the heavens makes a good shelter, the Lord is a Good genral * * * The Great Washington when hungry and raged, lay on the coald, frozen ground without blanket, then why not mee be lik Washington. I Glory in the honor and pride of a solgers life. Nothing suits me better. I hav Good officers. I love them, thay love mee, and all ways will."[8]

But Healy has a point. War *is* hell. Private Thompson died of smallpox the same year he wrote the above letter. If Michael Healy had served in the Medical Department of the Confederate Army, would his religious beliefs been violated by attending a dying soldier who, if nursed to health, would probably have gone back into action? If smallpox serum had been available, would Healy have refused to vaccinate because Private Thompson might thereby live to fight another day? All of this seems little short of Antichristian. Yet it is precisely where Petitioner's creed logically leads him.

■ Private Healy is not the judge of what constitutes noncombatant service and I disagree with him in that respect. However, in conscientious objection cases, what counts is what he believes, not what the judge thinks. "* * * those registrants who entertain sincerely held religious opposition to military service are to be classified I-O and made subject to civilian service only. The statute does not limit the exemption to those who are 'opposed to participation in war in any form' but provides exemption for all who are 'conscientiously opposed' to combatant or noncombatant service." United States v. Carson, D.C., 282 F.Supp. 261 at 269. Private Healy says he is conscientiously opposed to service as a medic. He appears to be sincere in the belief that it is contrary to the religious faith he holds to. There is no substantial basis for any finding to the contrary (*Cf.* Crane v. Hedrick, *supra*) and Petitioner is entitled to discharge.

It is therefore ordered that the petition for habeas corpus be granted and that Private Michael P. Healy is discharged from the custody of the United States Army and from the custody of Respondents. The effective date of this order [which is entered exactly one year after Petitioner's induction] is stayed

8. Review by Lenoir Chambers in The Virginia Magazine of History and Biography, July, 1968, p. 372) of Georgia Boys with "Stonewall" Jackson, by Aurelia Austin, (University of Georgia Press, 1967).

for thirty (30) days to permit Respondents to appeal, if so minded. Petitioner will be discharged at that time or whenever non-appeal is formally indicated, whichever date is earlier.