**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Laurence Adrian WINGERTER, Jr.,
Defendant-Appellant.**

**No. 27392.**

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1970.

———◆———

Michael E. Tigar, Washington D. C., Bernard Ladon, Lang, Cross, Ladon, Op-

**1016**

penheimer & Rosenberg, San Antonio, Tex., for defendant-appellant.

Ted Butler, U. S. Atty., Reese L. Harrison, Pr., Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GEWIN, THORNBERRY and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge.

Laurence Adrian Wingerter, Jr. appeals from his conviction of knowingly, wilfully refusing to submit to induction into the Armed Forces of the United States.[1] When ordered to report for induction, Wingerter was classified I–A–O, conscientious objector available for noncombatant military service. Wingerter reported to the induction station and submitted to pre-induction processing, but refused to take the symbolic step forward. Thereafter, he was indicted, convicted upon a trial to the court, and sentenced to a three-year term of imprisonment.

At trial Wingerter asserted as a defense to the criminal charge against him that his I–A–O classification was invalid.[2] Instead, he urged that he was entitled to exemption from military training and service because of his conscientious objection to participation in war in any form, including noncombatant service. The District Court rejected this defense on the ground that the I–A–O classification had a basis in fact.

On this appeal Wingerter claims the denial of his request for classification as a Class I–O conscientious objector available for designated civilian work, to have been without basis in fact and to have been made after denial of procedural rights guaranteed by the regulations of the Selective Service System and due process of law. At all times during the administrative and judicial proceedings Wingerter expressed a willingness to perform civilian work contributing to the national health, safety or interest and stressed loyalty to his country.

Upon a careful consideration of the record, we can find no basis in fact for the denial of Wingerter's request for a Class I–O classification. For reasons that follow, the judgment of conviction must therefore be reversed.

Wingerter registered with Texas Local Board No. 9, San Antonio, Texas, on May 9, 1960. After having received two student deferments and a military deferment as a student under an R.O.T.C. program at Stanford University, Stanford, California, the registrant executed a Conscientious Objector Form, on October 13, 1964, claiming exemption from both combatant and noncombatant military service. The claim was denied by the local board and Wingerter was classified I–A on October 26, 1964. The I–O classification was again denied following a hearing by the local board on February 8, 1965. A week later, Wingerter appealed his classification, and the State Appeal Board in May 1965 requested an investigation and hearing by the Department of Justice, informing the Department that it, the Appeal Board, had tentatively determined that the registrant should not be classified in Class I–O or in a lower class. An inquiry was made and a hearing was held by the Department of Justice, resulting in the hearing officer recommending a I–A–O classification (conscientious objector available for noncombatant military service), in which recommendation the Chief of the Conscientious Objector Section of the Department of Justice concurred in a letter to the State Appeal Board on July 12, 1967. Despite the recommendation of I–A–O, the State Appeal Board unanimously classified Wingerter I–O (conscientious objector available for designated civilian work) on August 25, 1967. Wingerter then applied for and received a list of approved

---

1. The statutory provision violated is the Military Selective Service Act of 1967, § 12, as amended, 50 App.U.S.C. § 462.

2. The applicable statutory provision relating to conscientious objectors is Military Selective Service Act of 1967, § 6(j), as amended, 50 App.U.S.C. § 456(j).

agencies for the purpose of finding an acceptable civilian job and underwent the required physical examination. On September 26, 1967, the local board clerk forwarded Wingerter's file to the State Director.[3] On November 17, 1967, the State Appeal Board reconsidered the registrant's file and unanimously reclassified him I–A–O in lieu of the I–O classification previously given him by the same appeal board. A review by the Presidential Appeal Board, initiated by the State Director at Wingerter's request, resulted also in a I–A–O classification. Wingerter's subsequent refusal to take the symbolic step set into motion the judicial proceedings culminating in this appeal.

Being mindful of the finality accorded to board decisions and the narrow scope of judicial review,[4] we have diligently but fruitlessly searched appellant's Selective Service File to find a basis in fact to support the I–A–O classification and the denial of the I–O exemption formerly given to registrant.

The local board originally denied the I–O exemption and placed the registrant in Class I–A upon its determination that Wingerter's belief was not based on "religious training or belief." The religious beliefs test is expressed by United States v. Seeger, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965) as follows: "A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the statutory definition." The local board had before it at that time Wingerter's claim for a conscientious objector exemption and a letter which the registrant had written to Colonel Nanney of the R.O.T.C. at Stanford University which contained a recital of appellant's reasons for discontinuing his participation in the R.O.T.C. program. In the letter Wingerter professed a philosophy of pacifism, existentialism and adherence to the "Golden Rule." He expressed his abhorrence to killing and said that since he found the military opposed to life, he was compelled to leave the R.O.T.C. He considered this action as his "small but meaningful protest against man's inhumanity to man." He deplored his expe-

---

3. The letter of transmittal is reproduced in full, as follows:
"September 26, 1967
"State Headquarters
Selective Service System
515 Western Republic Building
702 Colorado Street
Austin, Texas 78701
　　　"Re: Wingerter, Laurence Adrian, Jr.
　　　　　41-9-42-165
　　　　　Apr. 30, 1942
"Dear Col. Schwartz:
"This cover sheet is forwarded at the request of Mr. Gulledge, Chairman of this local board.
"He spoke to you about it at the meeting yesterday.
"Please acknowledge receipt on copy of this letter.
　　　　　　　"BY DIRECTION OF THE LOCAL BOARD:
　　　　　　　(Mrs.) Esther P. Shupp, clerk
　　　　　　　Texas Local Board No. 9
"ESP/hr
"Encl"

---

4. Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946). See also Robertson v. United States, 5 Cir., 1969, 417 F.2d 440, 444; McCoy v. United States, 5 Cir., 1968, 403 F.2d 896, 904; Clay v. United States, 5 Cir., 1968, 397 F.2d 901, 915; Matyastik v. United States, 5 Cir., 1968, 392 F.2d 657, 658; Foster v. United States, 5 Cir., 1967, 384 F.2d 372, 373.

rience at R.O.T.C. summer camp in which he "learned a thousand different ways to kill a man." He said, "I learned methods of eliminating or controlling those with whom I disagreed. I learned how to deny existance [sic] to a large number of people. I would not have my existance [sic] denied, how can I deny someone else's." He could "give no support to an organization that exhibits man's worst traditional trait."

In Wingerter's application to the local board for a I–O deferment, he expressed a belief in a Supreme Being, which he characterized as "the source of good and power" and that his relationship with that source was what Paul Tillich calls the "ultimate concern." [5] He admitted belonging to no particular religious sect, stating that his beliefs had been acquired as a result of studying the works of many writers. The book, *Phenomenon of Man*, written by Teilhard de Chardin, a Jesuit, was of particular significance to him. He concluded the summation of his religious philosophy by stating:

> "I will give my life to save another, but I will not take someone else's to save that same person. Participation in the military requires that I kill if someone deems it necessary or at least that I support those who are willing to kill; I can do neither. Even as a medic I would support an organization whose function it is to kill. To help a wounded or dying man is one thing; to join and through my presence support the organization which has led him to his death is another."

The résumé of the Justice Department inquiry records the impressions formed of Wingerter by seventeen persons who were interviewed, including faculty members of the schools and colleges which appellant had attended, two of his fraternity brothers, co-workers, neighbors, and his father. Fifteen of the seventeen individuals interviewed attested to their belief in the registrant's sincerity in claiming a I–O exemption. Thereafter, on October 25, 1965, Wingerter, accompanied by a girl friend, appeared before a hearing officer of the Department of Justice. Wingerter told the hearing officer that his religious views were not impelled by any formal faith, but that he had been influenced by the teachings of Christ, Lincoln Steffens and Teilhard de Chardin, and by Existentialism and Zen Buddhism. Wingerter's companion also expressed her belief in his sincerity. The Justice Department report states the reasons why the hearing officer recommended Class I–A–O for registrant, as follows: "The Hearing Officer found that registrant has developed or is in the process of developing a conviction against infliction of personal violence upon another equivalent to a religious conviction held by a person professing in good faith an adherence to a conventional religion and that he is conscientiously opposed to participation in combatant military training and service." In recommending that Wingerter be denied the Class I–O exemption, the hearing officer considered the nature of the registrant's father's freight business, in which Wingerter is employed and in which he is associated with handling shipments of supplies to military bases. Wingerter stated that this aspect of his work had bothered him considerably but he had not sought other work, nor had he asked his father to discontinue that type of business and that he had succeeded in convincing himself that his work was compatible with his beliefs provided he did not personally seek to promote the military side of the business. The hearing officer also found pertinent, in rec-

---

5. In United States v. Seeger, 380 U.S. 163, 180, 85 S.Ct. 850, 861 (1965), in discussing the "ever-broadening understanding of the modern religious community," the Court quoted from the philosophy of Dr. Tillich, acceptance of whose views the Government had con-

ceded would come within the meaning of "religious training and belief," and affirmed the reversal of a conviction by the Second Circuit of a registrant whose "views 'parallel [those of] this eminent theologian rather strikingly.' "

ommending denial of Class I–O, the "fine distinctions" which Wingerter drew between working in a military hospital and in a hospital treating both civilian and military patients. The hearing officer concluded that noncombatant service, while distasteful to the registrant, would not violate any fixed belief on his part amounting to religious convictions, and recommended that he be classified I–A–O.

On July 12, 1967, the Chief of the Conscientious Objector Section of the Department of Justice concurred in the hearing officer's recommendation of Class I–A–O, making the additional observation that "the registrant seems not to have claimed conscientious objection until military service became imminent for him." However, the record shows that on December 23, 1963, when appellant first requested a Conscientious Objector Form, he was classified II–S and he was told by the local board that his file would not be reviewed until the expiration of that student deferment. He did advise the board, however, on December 23, 1963, of his intention to claim a I–O exemption. Letters in the registrant's file from Dr. Lagerstrom, a member of the Senior Staff at Stanford Electronics Laboratory, and from Bishop Jones of the Episcopal Diocese of West Texas, which were before the Appeal Board and the Justice Department, attested to the development of Wingerter's pacifist philosophy and religious convictions as unrelated in time and purpose to draft evasion. Moreover, the recommendation of the Justice Department for a Class I–A–O exemption was inconsistent with its finding that the registrant's claim was induced by imminence of induction. While the imminence of induc-

tion as a precipitant for a I–O claim clearly militates against the granting of that exemption,[6] the same reason would necessarily apply to the consideration of a I–A–O classification. Consistency would have required a classification other than one associated with religious convictions if the basis for the recommendation was the registrant's awareness of the imminence of induction.

The State Appeal Board was apparently cognizant of this inconsistency when, despite the adverse recommendation of the Justice Department, it unanimously classified Wingerter I–O and chose to ignore the hearing officer's impressions of Wingerter's fine distinctions between working in a hospital with only military patients and one with both civilian and military patients. The distinction is necessarily a fine one because of the very nature of the two categories which provide for the two separate types of duties. The first expression in the file of registrant's strong convictions against support of the military in any manner—his reasons for leaving R.O.T.C.—rebuts the finding of the hearing officer. His opposition is manifest throughout the entire file, and regardless of whether or not the board or the Court agrees with the distinctions Wingerter makes, there is nothing in the file which casts doubt on his convictions.

In respect to Wingerter's employment, the statement by the hearing officer that he was "associated with shipments of supplies to military bases" can hardly be assumed to form a proper basis for the hearing officer's recommendation.[7] No attempt was made in the administrative proceedings to determine the nature or the quantity of the shipments. At trial the percentage of such shipments

---

6. Witmer v. United States, 348 U.S. 375, 383, 75 S.Ct. 392, 396 (1955). See also Clay v. United States, 5 Cir., 1968, 397 F.2d 901, 919, vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1164, 22 L.Ed.2d 297; Nelloms v. United States, 5 Cir., 1968, 399 F.2d 295, 296; United States v. Taylor, 6 Cir., 1965, 351 F.2d 228, 230.

7. Cf. Parker v. United States, 372 U.S. 608, 83 S.Ct. 955, 10 L.Ed.2d 10 (1963); Harshman v. United States, 372 U.S. 607, 83 S.Ct. 955, 10 L.Ed.2d 10 (1963); Kessler v. United States, 5 Cir., 1969, 406 F.2d 151, 155.

was estimated to be no more than five per cent.

Following the unanimous classification of I–O by the Appeal Board, Wingerter applied for and received a list of approved agencies for the purpose of finding an acceptable civilian job and underwent the required physical examination. There is nothing of record to indicate why, approximately two months later, the Appeal Board reversed its former classification from I–O to I–A–O. No new or additional information had been received to justify the change.

In Estep v. United States, 327 U.S. 114, 122, 66 S.Ct. 423, 427, 90 L.Ed. 567 (1946), the Supreme Court articulated a basis for judicial reversal of board decisions "if there is no basis in fact for the classification." [8] Subsequently, in Dickinson v. United States, 346 U.S. 389, 396–397, 74 S.Ct. 152, 157, 98 L.Ed. 132 (1953), a ministerial exemption case, the Supreme Court, while recognizing the inapplicability of the "substantial evidence" test on judicial review, said that *"the courts may properly insist that there be some proof that is incompatible with the registrant's proof of exemption."* (Emphasis supplied.)

Later in Witmer v. United States, 348 U.S. 375, 381–382, 75 S.Ct. 392, 396, 99 L.Ed. 428 (1955), the Court distinguished the type of prima facie proof required by a registrant seeking a conscientious objector deferment from that required in ministerial exemption claims, and again discussed the "basis in fact" concept and scope of judicial review:

"[I]n Dickinson the registrant made out his prima facie case by means of objective facts—he was a 'regular or duly ordained minister of religion.' *Here the registrant cannot make out a prima facie case from objective facts alone, because the ultimate question in conscientious objector cases is the sincerity of the registrant in objecting, on religious grounds, to participation in war in any form.* In these cases, objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, *purely a subjective question.* In conscientious objector cases, therefore, any fact which casts doubt on the veracity of the registrant is relevant. \* \* \* In short, the nature of a registrant's prima facie case determines the type of evidence needed to rebut his claim. If the issue is the nature of his activities, as in Dickinson, the evidence providing 'basis in fact' must tend to show that his activities are other than as stated. If, as here, the issue is the registrant's sincerity and good faith belief, *then there must be some inference of insincerity or bad faith."* (Emphasis supplied.)

Finding no evidence of insincerity from the record or in Witmer's stated beliefs, the Court looked to the objective facts before the Appeal Board to see whether they cast doubt on the sincerity of his claim.

■ Applying the standard of judicial review applicable to conscientious objectors as required by *Witmer* and its predecessors, we have scrutinized the record for any inference of insincerity or bad faith. We have carefully studied each of the statements made by Wingerter relative to his purported religious beliefs and all of the objective facts before the Appeal Board and find no evidence of insincerity. We conclude, therefore, that appellant's prima facie claim has placed him in the statutory exemption, that there is nothing in his

---

8. See also Witmer v. United States, 348 U.S. 375, 381, 75 S.Ct. 392, 395 (1955); Gonzales v. United States, 348 U.S. 407, 412–413, 75 S.Ct. 409, 412, 99 L.Ed. 467 (1955); Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152 (1953); Robertson v. United States, 5 Cir., 1969, 417 F.2d 440, 445; Clay v. United States, 5 Cir., 1968, 397 F.2d 901, 917, 918, vacated on other grounds, 394 U.S. 310, 89 S.Ct. 1164; Kessler v. United States, 5 Cir., 1969, 406 F.2d 151; United States v. White, 5 Cir., 1969, 421 F.2d 487.

Selective Service File to rebut his claim, and that, therefore, there was no basis in fact to support the I–A–O classification.

Reversed.