Joseph Charles RAUTENSTRAUCH

v.

SECRETARY OF DEFENSE,
Melvin Laird, et al.

Civ. A. No. SA70CA172.

United States District Court,
W. D. Texas,
San Antonio Division.

May 20, 1970.

Gerald H. Goldstein, Levey & Goldstein, Maury Maverick, Jr., San Antonio, Tex., co-counsel, for petitioner.

Seagal Wheatley, U. S. Atty., Henry Valdespino, Asst. U. S. Atty., San Antonio, Tex., for respondents.

## MEMORANDUM OPINION

SPEARS, Chief Judge.

In his petition for writ of habeas corpus, petitioner, a private in the United States Army Reserve, alleges that he is being unlawfully detained and deprived of his liberty, and that disapproval of his application for discharge as a conscientious objector has no basis in fact, is a denial of due process of law, is arbitrary and capricious, is based upon a misinterpretation and misapplication of the law, regulations, directives and evidence, and is illegal and in violation of Army Regulation 135–25 and Section 6(j) of Title I of the Military Selective Service Act, as amended.

The denial by the Conscientious Objector Review Board (hereinafter referred to as Review Board) of petitioner's application for discharge was based on findings that (1) his conscientious objector beliefs are not truly held; (2) that his beliefs are poorly grounded in religious training and belief; and (3) any objection to war in any form truly held is based solely on philosophical views and a personal moral code. The board concluded that it did not believe petitioner was sincere in his beliefs, and that his application was not founded on legally acceptable grounds. Since this Court is of the opinion that there was no basis in fact for the refusal to discharge petitioner, the writ will be granted, subject to further draft board proceedings as hereinafter set forth.

Petitioner is assigned to the United States Army Reserve Control Group Delayed Enlistment Program, Fourth U. S. Army, at Fort Sam Houston, San Antonio, Texas. While he was working as a Training Officer with the General Electric VISTA Training Center in Austin, Texas, petitioner, on August 14, 1969, enlisted in an Army Officer Candidate School Delayed Entry Program, which would allow him up to 120 days to complete his work for VISTA, get his effects together at home, and report to the Officer Candidate School. He had never sought any conscientious objector

classification. On October 1, 1969, about six weeks after his enlistment, and five days before he was to report for active duty, petitioner requested the proper procedures for submitting his application for discharge, in which he stated, among other things, that during the preceding two weeks he had gone through a period of "great inner turmoil" [1] and now realized that he was a conscientious objector.

Army Regulation 135–25, which is similar to Army Regulation 635–20, governs the disposition of reserve members of the Army who claim to be conscientious objectors. Section 5(a) of said regulation states as follows:

"Consideration will be given to requests for discharge by reason of conscientious objection to participation in war, in any form, when such objection

develops subsequent to the member's entry into military service, whether such entry was by induction, enlistment, or appointment in any component of the Army."

Section 5(b) of the same regulation provides:

"Federal courts have held that a claim to exemption from military service under Selective Service laws must be interposed prior to notice of induction, and failure to make timely claim for exemption constitutes waiver of the right to claim. However, claims based on conscientious objection *growing out of experiences prior to entering military service, but which did not become fixed until entry into the service*, will be considered." (Emphasis supplied).

1. In his application for 1–O classification, petitioner detailed the reasoning behind his change of heart as follows: "I completed my work at the training center on August 22 and arranged to start basic training on October 6, 1969. It was not until I completed my work at the training center and drove back to Buffalo, New York, that I had time to think about my decision, my reasons for it, and its relation to my religious beliefs. After I arrived in Buffalo, I went through about two weeks of great inner turmoil. I began to ask myself some basic questions. I realized that as a citizen I had a duty to my country but what about the beliefs which I had expressed during the past three years? Could I so easily turn my back on them? * * * Could I so easily forget the beliefs which had been very much of my life up to this point? I had often said to friends that you don't find out what a person's religion or beliefs are by asking him, but by observing him; 'What does he do, how does he live, in what does he become involved?' So now I asked myself these same questions and seriously questioned if the decision to enter the Delay Entry Program was consistent with my actions in the past. Did I really believe in what I was about to do, and if not, why had I made the decision to go into the military as an OCS candidate? It was at this point that I began to review my reasons for the decision I had made. They included the following: First, I was concerned with my career and I knew that being an officer would enhance my future. The sec-

ond reason was that I considered myself to be quite flexible. I had been involved in many different types of situations over the past three years, including many leadership positions. I saw military involvement as just another task: one to which I could adjust. The third reason was that I was concerned about what my relatives would think if I would refuse to serve in the military if called. The fourth reason was that I was very busy at the time that I received my induction notice. Because of my deep involvement in other things from which I had to extricate myself, I was not able to think through my decision in the light of my beliefs. "I then realized that this was the first time in my life that I was about to be in a position in which I would be killing other human beings or at least a part of an organization which used this means to accomplish its ends. It was during this time of reflection and inner turmoil that the beliefs which had guided my earlier actions and development became clear to me. Therefore, it was necessary for me to justify to myself my entry into the military. I realized that the above mentioned reasons were not consistent with my beliefs. It was more than just an adjustment to a different task. The means and ends of the task should have been taken into consideration. I had been concerned more with what other people might think about what I would do, and the effect on my career, rather than what was right. I realized then that I had made a wrong decision."

Section 5(c) of the regulation states:

"Consideration will not be given to requests for discharge based solely on conscientious objection which—(1) Existed but was not claimed prior to member's initial entry into military service either by induction or enlistment or appointment in any component of the Army; or (2) Existed but was claimed and denied by Selective Service prior to member's induction into the active military service; or (3) Is based upon essentially political, sociological, or philosophical views or a merely personal moral code; or (4) Claims objection to a particular war."

■■ The law is well settled that the denial by the Armed Forces of a serviceman's application for discharge as a conscientious objector under DOD 1300.6, and the applicable military regulations, may be subjected to judicial review. Owens v. Commanding General, 307 F. Supp. 285 (N.D.Cal.1969). The essential test of conscientious objection is sincerity. Witmer v. United States, 348 U.S. 375, 381, 75 S.Ct. 392, 99 L.Ed. 428 (1955). It is well, therefore, to consider, at the outset, where the burden of proof lies with respect to sincerity.

■ The cases seem to hold that the applicant bears the burden of establishing a *prima facie* case, but that once this is done, the burden should shift to the Army to show something in the record supporting its denial. United States v. St. Clair, 293 F.Supp. 337, 344 (E.D. N.Y.1968), and the cases cited therein. Since the applicant stated his beliefs with apparent sincerity, and the only criticism of his demeanor came from the Commanding Officer who felt that fear was his prime motivation,[2] it is the duty of the Court to examine the objective facts

before the Review Board to see whether they cast doubt on the sincerity of the claim. See Witmer v. United States, supra 348 U.S. at 383, 75 S.Ct. 392.

The facts in this case are somewhat similar to those present in U. S. ex rel. Healy v. Beatty, 424 F.2d 299 (5th Cir., 1970), where the Court granted the petition for writ of habeas corpus. Here, as in *Healy*, the petitioner is a Catholic, who attended parochial schools and a Catholic College, and he served two years as a VISTA Volunteer. While his recitation relative to his religious training and belief is not as eloquent as that of Healy, he expresses a belief in God, and says that God is a Force above man. He further states:

"I believe that goodness and truth (are) directly related to the development of all human beings, since God is the cause of all human life. All relationships and activities which are a part of human development and act to increase the closeness of men, are good. Killing of other human beings is inherently evil because it destroys rather than develops. It is a direct denial of the goodness and Spirit of God in man. Today it is even more evil because man has the potential to destroy all life on earth. Even though I realize that I have a duty to my country, I must first consider my duty to my conscience and to God. I believe that alternatives to war will be found and that men must refuse to fight."

■ In Pitcher v. Laird, 421 F.2d 1272 (5th Cir., January 30, 1970), the Court held that before a conscientious objector classification may be denied on the ground that the applicant's beliefs are based upon "political, sociological or philosophical views or on a merely per-

---

2. The Commanding Officer stated: "From my own observations, listening to his speech and watching his nervous mannerism, it is my personal opinion that fear is his prime motivation in taking this stand and therefore I would not desire to have him in the Army under any circumstances. * * * The psychological punishment he has inflicted on himself

through his actions could not be increased by forcing him to serve the obligation he is seeking so desperately to avoid." The Commanding Officer was convinced, however, that petitioner "conscientiously believes that he is upholding his ideals", and that his "apparent change of heart" was "his unconscious means of avoiding what for him is a dangerous situation."

174

sonal moral code", those factors must be the *sole* basis of his claim. If, therefore, petitioner was substantially motivated by views derived from religious training and belief, he would still be entitled to the exemption as a conscientious objector, and "the fact-trier must give great weight to the applicant's claim that his beliefs are an essential part of his religious faith." U. S. ex rel. Healy v. Beatty, 300 F.Supp. 843 (S.D.Ga.1969), Beatty, 300 F.Supp. 843 (S.D.Ga.1969) (affirmed, 424 F.2d 299, 1970).

■ Although AR 135–25 § 6(a) (4) authorizes the submission of statements of individuals "who can attest to the sincerity of applicant's professed convictions regarding participation in war", the Review Board concluded, based upon its "considerable experience", that attestations such as those set forth in the seven letters submitted by petitioner, "are made solely on the basis of emotion, vice objective reasoning as set down in the governing law." Obviously, the regulation would be rendered completely meaningless if the Review Board could arbitrarily ignore statements submitted by an applicant. Inasmuch as this Court disagrees with the reasons assigned by the Review Board for its refusal to accord any probative value to the letters submitted by the petitioner herein, they will be evaluated in the light of all the facts and circumstances of the case bearing on petitioner's sincerity in making his claim.

Without detailing all of the contents of the letters furnished by petitioner, it is sufficient to say from the excerpts which follow that they are relevant on the question of petitioner's sincerity; and that they fully support his claim based on religious training and beliefs, the sincerity of those beliefs, and the fact that his conscientious objection did not crystalize until after his enlistment in the Armed Services.

One of those who wrote was Reverend James A. Williams, of Austin, Texas, Director of the VISTA training program, in which petitioner served as a trainer. He stated:

"Mr. Rautenstrauch's position is based firmly upon religious convictions and beliefs. It is ironic that he may be more religious (in the best sense of the word) than I am, although I am a minister. Just prior to his leaving my staff (VISTA) we had a brief opportunity to discuss the values we had been working under, attempting to focus them on his immediate situation. He had received his induction notice and was concerned as to how our values and religious beliefs could serve as a guide when there was a deep conflict between duty and conscience. * * * "

Reverend Father Ira V. Lott, of the Santa Rosa Medical Center in San Antonio, wrote:

"Joseph Rautenstrauch is a conscientious objector. His religious beliefs are sincere, and it is my judgment that the conduct of his life substantiates this claim. He is a member of the Roman Catholic Church in good standing."

Petitioner's parish priest, Reverend David J. Peter, of Buffalo, New York, said:

"It seems to me that Joe (petitioner) is sincere in his intention and is acting with good reason and in a responsible way."

Virginia Schramm, a VISTA program officer, stated:

"Though Mr. Rautenstrauch has always impressed me as non-violent by nature, he had never discussed this principle with me in relation to his participation in the Armed Forces. It was not until after he had enlisted that he realized his strong objections to killing and felt compelled to take a stand thereon. * * *

"I, personally, have mixed feelings about conscientious objectors. It seems imperative to examine each case on its own merits. * * * (Petitioner's) stance is consistent with his

character, philosophy and beliefs as I have known them."

A psychology professor, Franklyn A. Rhodes, who had taught petitioner in college, closed his letter by saying:

"After all is said and done, I can make no more emphatic recommendation as to his sincerity and religious conviction than to say that he is one of the very few human beings to whom I would entrust my life."

Palmer R. Ulman, a family service director, to whom petitioner was assigned by VISTA for a period of one year, summed up his feelings as follows:

"In conclusion, it seems to me, in my experience with Mr. Rautenstrauch, that his actions, involvement and concern for his clients here (are) totally consistent with his being a conscientious objector and with his religious convictions as he has expressed them to you."

Michael W. Shurgot, a personal friend of petitioner for eight years, concludes in his closing paragraph:

"Thus, I firmly believe that Mr. Rautenstrauch, by his present stand, is acting in accordance with his past life, and with the development of his character up to the present moment. He is in all ways a Christian, and his life has been a testimony to the greatest commandment of all, namely, to love one's fellow man."

The hearing officer, the only person who directly challenged petitioner's sincerity,[3] found some "inconsistency" in petitioner's beliefs, because he had participated in ROTC, enlisted in OCS, and then applied for discharge as a CO. Petitioner explains that he went into ROTC because it was compulsory at the University he attended, but that he would not do so now; that when he enlisted in OCS, he was so occupied with his duties as a VISTA worker that he had not really had an opportunity to think about being in service. His explanation finds support in Reverend Williams' letter,[4] and in United States v. Wingerter, 423 F.2d 1015 (5th Cir., 1970), where the Court of Appeals, in reversing this Court, could find no inconsistency in the file of a registrant who had not only participated in ROTC, but claimed a deferment through that participation.

In addition, the hearing officer found that the Catholic Church, which petitioner declared "to be the most prominent reason for his objection," does not as a church prohibit its members from serving their country's Armed Forces. However, this fact would not, in and of itself, support a finding that petitioner's beliefs are poorly grounded in religious training and beliefs. In *Healy*, supra, the District Court said: "The conscientious objector classification is based upon the subjective religious beliefs of the particular individual, not upon the religious tenets of an organization of which he is a member." This was affirmed by the Fifth Circuit. The First Circuit, in Bates v. Commander, First Coast Guard District, 413 F.2d 475 (1st Cir., 1969), expressed the principle this way: "It has been held, however, and we think properly, that '[T]he religious belief need not lead inexorably to conscientious objection, that is to say, it need not be a tenet of the faith as in the case of Jehovah's Witnesses. It is enough if the registrant has a religious faith and, by reason of faith, he is opposed to participation in all war'."

3. While the hearing officer did challenge petitioner's sincerity, because of what he felt were inconsistencies in his actions and statements, he did not comment upon petitioner's demeanor or appearance during the interview.

4. In connection with petitioner's explanation that he was heavily involved in VISTA work, Reverend Williams stated as follows: "In any case, he was thoughtful and troubled when I last saw him, so it came as no surprise to learn that he had worked through to this position after leaving the Training Center and having time for serious thought about himself. This past year has been such that one hardly had time to consider personal issues."

The Review Board found, with respect to petitioner's religious beliefs, that:

"Nowhere in his application does he attempt to show that his professed religious beliefs changed between the time he applied for OCS and the date of his application."

■ Religious training and beliefs provide the basis for one's objection to war in any form. It is the objection which must become fixed and manifest itself subsequent to entry into the Armed Forces, not the religious beliefs which underlie that objection. AR 135–25 § 5(b). In construing AR 635–20, which is identical in import to AR 135–25 § 5(b), the Court of Appeals in *Healy*, after quoting from AR 635–20 § 3(a), said:

"This does not mean that the religious belief upon which the objection is based must manifest itself only subsequent to entry on active duty but rather, the objection itself must so manifest itself and not exist prior to entry on active duty. This conclusion is aptly illustrated in the sub-paragraph following the above quoted language where it is stated:

" '[C]laims based on conscientious objection growing out of experiences prior to entering military service, but which did not become fixed until entry into the service will be considered. AR 635–20 Sec. 3(b).' "

While it is true that petitioner's religious belief may have manifested itself prior to applying for OCS, there is no basis in fact for a finding that his objection to war, in any form, had become fixed prior thereto.

■ The Review Board stated that the Interviewing Chaplain was of the opinion that petitioner's beliefs were not based on religious training. The Chaplain's letter in full reads:

"Based upon an interview with Joseph C. Rautenstrauch, initiated by him to discuss I–O Classification, it is my opinion that his basis for requesting a I–O Classification does not come from any historical religious training, belief and practice but of his own personal interpretation of religion and church history. I feel that he is sincere in his desire to be classified as a I–O."

In effect, the Chaplain found that petitioner's claim was based on a sincere personal interpretation of religion, rather than on an orthodox historical view. This would seem to be the kind of belief that the Supreme Court was speaking of when it said in United States v. Seeger, 380 U.S. 163, 165, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965):

"* * * the test of belief 'in a relation to a Supreme Being' is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God of one who clearly qualifies for the exemption. Where such beliefs have parallel positions in the lives of their prospective holders we cannot say that one is 'in a relation to a Supreme Being' and the other not."

In speaking of the responsibility of those charged with the decision making responsibility, the Supreme Court further said: "Their task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, *in his own scheme of things*, religious." (Emphasis supplied). *Seeger*, supra at 185, 85 S.Ct. at 863. And as the Court said in *Bates*, supra: "[T]he statute does not distinguish between externally and internally derived beliefs." Under the circumstances, it appears that the Chaplain's statement that the basis for petitioner's claim is his "own personal interpretation of religious and church history", is clearly within the Supreme Court's definition.

■ The Selective Service System wrote a letter dated February 2, 1970, in which the opinion was expressed that petitioner would not be classified as a conscientious objector if he were then being classified by Selective Service. The letter states no facts upon which this conclusion was based, so it cannot be relied upon by the Review Board to

bolster its case. Bates v. Commander, supra; Cooper v. Barker, 291 F.Supp. 952, 957 (D.Md.1968).

This Court has considered the entire record in this case, including, but not limited to, the contents of the seven letters submitted by petitioner, but has been unable to find a basis in fact for the decision of the Review Board. As a consequence, the writ of habeas corpus is granted, and petitioner is discharged from the custody of the United States Army; provided, however, the granting of this writ shall be without prejudice to further draft board proceedings with respect to petitioner as a Selective Service registrant, which are not inconsistent with this opinion or the Selective Service law.

The effective date of this order is stayed until June 1, 1970 to permit respondents to appeal if they so desire. In the event an appeal is taken prior to June 1, 1970, and the date petitioner is ordered to report to active duty is extended, the effective date of this order will be extended to the date of final judgment herein, or until the date petitioner is ordered to report for active duty, whichever comes first.